UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MM PROTON I, LLC,<br><br>                Plaintiff,<br><br>         -against-<br><br>YORY LLC AND CYCLE THERAPY NYC INC.,<br><br>                Defendants. | Index No. 17-cv-10102<br><br>**DECLARATION OF<br>YACOV TOLEDO<br>IN OPPOSITION TO<br>PLAINTIFF'S APPLICATION** |

I, Yacov ("Jacob") Toledo, declare:

1. I am a partner of Defendant Cycle Therapy NYC Inc. ("**Cycle Therapy**"), which is a tenant of Defendant Yory LLC (collectively, "**Cycle**"). I have had extensive contact with Plaintiff MM Proton I, LLC ("**Plaintiff**") and, consequently, am fully familiar with the facts and circumstances described below.

2. I submit this declaration in opposition to Plaintiff's motion for a preliminary injunction. Cycle is the aggrieved party, the party with legitimate claims and the party being exploited by this federal lawsuit. Plaintiff, our neighbor, caused extensive damage to our five-story building during the construction of its new building; our entire building shifted from Plaintiff's drilling and blasting and, consequently, leans a number of degrees off of center. The damage is not in question; it is acknowledged and addressed in a license agreement between the parties entered into after the damage was done. The problem is that Plaintiff refuses to pay for the damage it caused in violation of the License Agreement. Plaintiff's motion suggests that, without detail or any evidence, Cycle is somehow in violation of the License. As set forth below, the opposite is true.

3.     Also fictitious is Plaintiff's claim of irreparable harm.  This dispute is purely about money.  Plaintiff never mentioned any so called deadline after which Plaintiff would lose its property to a New York City government agency.  The first I heard of any such deadline was when I read Plaintiff's motion papers.  In Plaintiff's own words, as provided in detail below, Plaintiff claimed to be at risk of <u>losing money</u> if a portion of the corrective construction work did not proceed in the near term.

4.     To be clear, Cycle wants to move forward with the construction work to fix our building.  The existing damage is impairing our operations.  However, Plaintiff has refused to pay certain invoices of expenses that we already incurred and, more significantly, has objected to more than 60 percent of the estimated cost of repair.  Plaintiff only mentioned and is interested in that portion of the remediation that impacts its property, which represents a small fraction of the total cost of repair.  This entire lawsuit appears to be an ill-fated attempt to put pressure on Cycle to proceed with just a portion of the remediation (the part that benefits Plaintiff) without regard for the majority of the restoration, or to accept a lesser amount for all of the damage caused.

**The Damage**

5.     Yory LLC owns the five-story building at 230 East 127th Street (the "**CT Building**") that is home to Cycle Therapy.  In the 15,000 square foot five-floor facility, Cycle Therapy operates the largest motorcycle shop in the New York City area.  Cycle Therapy sells and repairs new and used motorcycles, scooters, mopeds, three-wheel and all-terrain vehicles.  The entire first floor is a dedicated retail shop selling motorcycle related parts and accessories.  The repair shop is in the basement.  The second and third floors contain dedicated showrooms.  The fourth and fifth floors are used for storage.

Cycle Therapy also stores motorcycles and other similar type vehicles year round (but mostly over the winter).

6.      The CT Building is over 100 years old.  Plaintiff acquired the adjoining lot to build a medical facility.  The parties entered into an initial license to allow Plaintiff to, among other things, conduct a pre-construction survey of the CT Building.  Before commencing construction of its building, Plaintiff hired an engineering firm to conduct the pre-construction survey and the resulting June 2, 2015 survey concluded that the CT Building was in "fair condition."  See select pages of the survey attached hereto as **Exhibit** 1.  Plaintiff's principal, Robert Murphy ("**Murphy**"), erroneously reported to the Court that the CT Building was "in poor condition" according to the survey.  Declaration of Robert Murphy ("**Murphy Decl.**") ¶8.

7.      At some point in the fall of 2015 Plaintiff commenced extensive drilling and blasting on its site.  I subsequently learned that Plaintiff had to drill down more than 80 feet to reach the bedrock beneath its site.  Using a very large drill, Plaintiff drilled large caissons into the ground, many in close proximity to the CT Building.  Highly pressurized water was also blasted into the subsurface to help lay Plaintiff's foundation.

8.      The result is that for more than six months, the CT Building shook violently during drilling and blasting.  It was extremely loud, disruptive and scared away customers who felt unsafe inside the CT Building.  The New York City Department of Buildings ("**DOB**") was on site regularly, often closing down the street that our customers use to access our business.  At one point during the drilling, the DOB required Plaintiff to install vibration monitors and sensors throughout the CT Building.  Construction dirt, dust and debris regularly found its way inside the CT Building.

Between the scaffolding and other construction activity and street closures, Cycle's business deteriorated during the course of construction.

9. Most significant, however, was the damage caused to the CT Building from all of the drilling and blasting. After the monitors had been installed (midway through the drilling), the entire CT Building shifted, leaning over several degrees like the Leaning Tower of Pisa. In fact, the DOB determined that the CT Building was now leaning and encroaching onto Plaintiff's property. New cracks in the walls and floors emerged, some large enough to stick a hand through. The interior of the CT Building became exposed to the elements in a number of places. The monitors that Plaintiff installed confirmed the damage.

10. Aside from cracks and other damage to the masonry, the windows and the doors to the CT Building had been compromised. Windows would not open or would break from the pressure of the now shifted building. Doors were no longer aligned and could not open. This was devastating to a retail business that depended on customers coming in and out of our space, and for moving vehicles in and out of the building.

11. In the middle of the drilling, Cycle had to hire its own engineer, Sean Fennell ("**Fennell**"), to monitor Plaintiff's construction activities and in particular the drilling and blasting.

12. Today, while extensively damaged, the CT Building is stable. It has been examined by Fennell as well as the DOB and the FDNY.

**The License**

13. After the damage had been done, the parties negotiated a new license agreement dated August 25, 2016 (the "**License**"). See License attached hereto as

**Exhibit** 2.  The License gave Plaintiff access "to provide exterior support and underpinning" and to install "certain equipment to monitor the effects of [Plaintiff's] Project."  License ¶¶ F, G.  Plaintiff was "solely responsible to design, install and maintain any and all safety or protective measures for the benefit of the [CT] Building."  License ¶ 3(b).

14.  In the License, Plaintiff acknowledged that it caused "certain Building damage."  License ¶ 10(b).  The License itemized a number of different areas in need of repair or replacement:

  a.  "metal and glass storefront glazing system"
  b.  "metal coiling security grills"
  c.  "security alarm sensors throughout the windows and doors in the entire building"
  d.  "elevator shaft" and elevator "equipment"
  e.  "basement slab"
  f.  "exterior façade"
  g.  "exterior steel"
  h.  "interior cracks, racked doors and windows, uneven floors, walls and plumbing fixtures"
  i.  "roof"

As but one example, the License pointed out that "there is water penetrating through the foundation wall into the basement.  This water penetration shall be stopped and any damage resulting from the water penetration repaired."  License ¶ 10((b)(iv).

The list was not meant to be inclusive and did "not constitute the limit of Licensee's liability under this Agreement."  License ¶10(b).

15.     Plaintiff assumed a number of financial responsibilities under the License. Specifically, Plaintiff agreed "to pay for the repair of any physical damage to the [CT] Building…whether arising prior to or after the date hereof." License ¶ 10. More broadly, Plaintiff agreed to indemnify and hold Cycle harmless "from any and all losses, claims, costs, expenses" relating to Plaintiff's performance under the License and enforcement of the License itself. License ¶ 8.

16.     Plaintiff also agreed to reimburse Cycle Therapy for the cost of moving and storing inventory (License ¶ 2), "lost income resulting from [moving and storing inventory]" (License ¶ 2) and the "cost of consultants and attorneys" (License ¶ 7).

17.     The License did not set forth any deadlines for completing the remediation. On the contrary, the License said that "Licensor shall not be required to perform the repairs before being reimbursed by [Plaintiff]." License ¶ 10(c).

**The Corrective Work**

18.     The DOB required Plaintiff to submit a plan for remediating the damage it had caused. Plaintiff hired the engineering firm, Thornton Tomassetti, to prepare specifications and plans to address the CT Building's movement ("**TT Scope**"). Thornton Tomassetti called for the installation of anchors in the CT Building through a wall in Plaintiff's building. In other words, the two buildings are to be connected by these anchors. The anchors are intended to support the compromised floor joists in the CT Building. In correspondence, the parties have referred to the TT Scope as "joist work." Murphy described "joist ties as an extra form of structural bracing" that would "connect the adjoining walls of the CT Building and the new proton center." Murphy

Decl. ¶13.  Fennell reviewed and approved of the TT Scope on behalf of Cycle.  The TT Scope is expressly called for in the License.  License ¶ 10(b).

19. Cycle also retained Fennell to prepare specifications and plans to address the remediation of the rest of the building (the "**Fennell Scope**").  The Fennell Scope encompassed the corrective work set forth in paragraph 10(b) of the License that is listed above, notably the repair or replacement of the windows, doors, roof, masonry, cellar slab, elevator, etc.

20. The estimated cost of the TT Scope is approximately $250k.  The estimated cost of the Fennell Scope is approximately $1.3 million.

**Plaintiff's False Claim of Breach**

21. Plaintiff's papers focus exclusively on the TT Scope, the joist work.  That is the only part of the remediation that impacts Plaintiff's building.  Plaintiff claims that (i) an agreement had been reached over the joist work, (ii) Fennell agreed to perform the work and that (iii) the only thing preventing that work from proceeding was Cycle's lack of cooperation.  Murphy Decl. ¶¶ 14, 15, 21.  In other words, Murphy contends that Cycle has "failed to perform on their obligations, including but not limited to permitting the joist tie work to be performed."  Murphy Decl. ¶18.  This is simply untrue.

22. The parties never reached an agreement over the joist work.  Initially, Plaintiff assumed responsibility for the TT Scope under the License:  "As part of the Protection Measures [Plaintiff] agrees to install wall anchors…."  License ¶ 10(b).  Plaintiff's contractor pulled a permit to do so and sent a construction crew to the CT Building to conduct a test of a sample anchor.  This required Cycle Therapy to relocate motorcycles and other equipment to a storage facility the cost of which Plaintiff paid.

Plaintiff's construction crew cut into one of the floors, ceiling and wall to install a joist anchor. It took more than half a day to complete just one anchor (the TT Scope called for 200 or more of these anchors to be installed).

23. At some point after that one time effort, Plaintiff realized that the work of anchoring one building to the other would be difficult, time consuming and expensive; floor by floor the CT Building would need to be evacuated to allow the anchors and through wall work to occur. This would be very disruptive to Cycle Therapy's business; the intrusion needed to be mitigated. Consequently, Plaintiff asked that Cycle take over and perform the joist work even though under the License it was Plaintiff's responsibility.

24. Plaintiff asked and Fennell agreed to perform the joist work. Fennell participated in the negotiation with Plaintiff over the cost of the joist work. In his declaration Murphy stated that Plaintiff "has guaranteed payment to Fennell Engineering in accordance with a price and a payment schedule agreed to by Fennell Engineering." Murphy Decl. ¶21. This is wholly inaccurate. Plaintiff never agreed to a price with Cycle or Fennell and the work has not proceeded for that reason.

25. Plaintiff also claims that the joist work has not proceeded because Yory LLC has not signed an easement agreement it prepared ostensibly per the direction of the DOB. Murphy Decl. ¶14. Plaintiff contends that the DOB required Plaintiff to grant Yory LLC an easement to address the fact that the CT Building is encroaching onto Plaintiff's property. Plaintiff did not support this claim with any evidence of the DOB's supposed request. While signing an easement is not required under the License (and Plaintiff did not cite to any such provision in its motion papers), Plaintiff did not object to the easement, per se, but, as Murphy stated in his declaration, the easement is tied to the

joist work.  I reiterated to Murphy that once the parties reach an agreement on the joist work, Yory LLC will proceed with an easement.  The easement is a red herring.

26. It should be noted that the <u>form</u> of the easement agreement presented by Plaintiff is problematic and raises a number of unresolved issues.  If the DOB is actually requiring Plaintiff to grant rights to Yory LLC to resolve an encroachment issue, why does Plaintiff need Yory LLC's signature at all?  The grant is unilateral so requiring the grantee's (Yory LLC's) signature makes no sense.  If, however, Plaintiff's intent is to subversively take away Yory LLC's property rights (<u>e.g.</u>, adverse possession rights), then perhaps Plaintiff's interest (but not need) for Yory's signature makes sense.  This needs to be explored.  Separately, Plaintiff's proposed form agreement lacks sign-off from EDC and Plaintiff's lenders, which puts at risk Yory LLC's rights in the event of reversion or foreclosure.  These are surmountable issues but the easement agreement that Plaintiff is asking the Court to implement is flawed in and of itself.

27. The larger problem is the lack of agreement over the remainder of the work.  The License does not require or contemplate that the restoration work be done in some piecemeal fashion, or that Plaintiff's self-interested scope (the joist work) be prioritized over other work.  The License simply says that "Licensor shall not be required to perform the repairs before being reimbursed by [Plaintiff]."  License ¶ 10(c).

**Plaintiff's Additional Breach**

28. Under the License, Plaintiff is responsible for the cost of remediating damage to the CT Building.  "Payment for the agreed repairs shall be based upon one or more written proposals obtained by Licensor and submitted to Licensee to be adjusted within thirty (30) days of submission."  License ¶ 10(c).  Further, "Licensor shall not be

9

required to utilize a bidding procedure, or to seek the lowest bid, but may seek proposals from any contractors it deems to be qualified." Id.

29. In accordance with the License, Cycle solicited two bids based on the Fennell Scope. This was intended to address all of the work required to repair the CT Building after the joist work was completed and the buildings were tethered together. The vast majority of the total remediation cost was based on the Fennell Scope and not the TT Scope. The two bids both estimated the cost at approximately $1.3 million.

30. Once we received the two bids, we authorized counsel to submit to Plaintiff the bids along with the Fennell Scope on which the bids were based. They were transmitted to Plaintiff on September 28, 2017. The cover email to Plaintiff explained that the Fennell Scope "represents a thorough review of the entire building, as seen from [Fennell's] work, and the two estimates which are presented have been vetted and afford Cycle Therapy with the ability to restore their building and to allow it to stand for many years." 9/28/17 Email attached as **Exhibit** 3.

31. The License gave Plaintiff thirty days to request adjustments to either of the bids. License ¶ 10(c). Plaintiff did not substantively respond to the Fennell Scope or the bids for months. Plaintiff just ignored the bids and the Fennell Scope. It was not until Cycle pressed the issue that Plaintiff finally responded on January 9, 2018, albeit reluctantly and preliminarily.

32. The net result is that Plaintiff rejected $800,459.96 out of the $1,371,065.70 estimated for the Fennell Scope. See 1/11/18 Email attached hereto as **Exhibit** 4. Among other objections, Plaintiff denied responsibility for the exterior masonry repair work where there was documented extensive movement and cracking of

the CT Building.  Similarly, Plaintiff abdicated responsibility for the exterior window replacement cost even though the windows need to be replaced due to the movement of the building.  Plaintiff's knee-jerk reaction to the Fennell Scope did not come with much of an explanation for its objections or revised cost estimates, nor did Plaintiff provide alternative bids to support its contentions.

33.  Procedurally, Plaintiff's objections were untimely.  Plaintiff either breached the License 30-day deadline to respond or waived the right to contest the cost of the Fennell Scope by waiting several months before responding.  Certainly Plaintiff did not act in good faith, sitting on its hands for months, awakening with a low ball reimbursement offer and a federal lawsuit when its insulting offer chilled discussions over the remediation work.

34.  Based on this context, it is not surprising that Plaintiff's motion papers ignore the Fennell Scope.  Presumably this is because the Fennell Scope represents a significant expense for Plaintiff and, as stated above, remediating the CT Building does not benefit Plaintiff's building.

**Plaintiff's Other Breach**

35.  One other important fact that Plaintiff's motion papers ignore is there are a number of invoices submitted to Plaintiff that have not been reimbursed as of yet.  In the shortness of time to respond to this injunction motion we have not been able to sift through all of our records to identify the specific outstanding invoices, but we have been complaining to Plaintiff about them for some time.

36.  Instead of acknowledging the outstanding invoices in its motion papers, Plaintiff exaggerated the amount of monies paid to Cycle to date.  Specifically, Murphy

claims to have paid Cycle in excess of $500k. Murphy Decl. ¶16. This statement is contradicted by Plaintiff's 1099, which indicates that Plaintiff had paid Cycle only $265,882.76. See 1099 attached as **Exhibit** 5. Of those monies, $82,400 went directly to pay attorneys' fees, $14,200 went to pay Fennell's fees and the balance went to Cycle for reimbursement of expenses to remediate certain damage (e.g., storage costs).

**No Irreparable Harm**

37.     In his declaration, Murphy warns that if "the proton center does not achieve a certificate of occupancy by July 15, 2018, then EDC has the right to re-enter and reacquire the Property." Murphy Decl. ¶6. I find this statement incredible for a number of reasons.

38.     First, in all of our extensive negotiations and communications about the restoration work, Murphy never mentioned this deadline to me or any other representative of Cycle. If this were a real deadline, he would have mentioned it in his numerous emails, meetings and calls to discuss the timing of the joist work.

39.     Instead, Murphy only complained about lost profit in the event of delay. For example, in a January 6, 2018 email, Murphy wrote that the "delays are costing us money….If we don't settle this matter immediately, then we will pursue you for those delay damages, which are very significant." 1/6/18 email attached hereto as **Exhibit** 6. The email is silent with respect to any deadlines or a risk of losing the property. The following week Murphy wrote "timing is urgent, as we are about to incur additional very, very substantial economic losses." 1/12/18 email attached hereto as **Exhibit** 7. Again, there is no mention of any deadline or risk of losing the property.

40. The fact that delay means only money to Plaintiff makes sense because Plaintiff is not curing or treating cancer. Plaintiff is a for profit organization serving as a real estate developer constructing a building for a consortium of hospitals. Murphy said as much in his Declaration: "The Medical Centers entered into a lease arrangement with MM Proton in which MM Proton would finance, build and lease the proton facility to the consortium." Murphy Decl. ¶5. The hospitals, in turn, are paying Plaintiff significant sums in rent for the building. According to Murphy, the Medical Centers have paid "more than $70 million to develop the proton center." Since Plaintiff is responsible for financing the proton facility, the question is, how much of that $70 million already went into Plaintiff's pockets? Murphy omits how much money and profit Plaintiff has made to date.

41. *Second*, if there was a real risk of losing the property to EDC, why did Murphy not include a copy of the EDC Agreement at the heart of that risk? The answer: the terms undermine Plaintiff's claim of irreparable harm. In response to Plaintiff's motion, Cycle's attorneys obtained a copy of the EDC Agreement and the accompanying deed for Plaintiff's property, both of which are attached hereto as **Exhibit** 8. Under that agreement and exhibited deed, Plaintiff must obtain a temporary certificate of occupancy on or around July 15, 2018. Deed ¶ A. I do not see any reference in these documents to a May 1, 2018 deadline or $3 million in penalties, as Plaintiff's motion papers contend.

42. I do note that both the EDC Agreement and the accompanying deed contain cure provisions in the event Plaintiff cannot obtain a temporary certificate of occupancy by the deadline. In that circumstance:

> [EDC], at its option, and after giving [MM Proton] notice and thirty (30) days to cure such default (or, **if such default shall not**

13

> **be curable within thirty (30) days, then such longer period of time as may be necessary so long as [MM Proton] shall be using due diligence to effect such cure**), shall…have the right to re-enter and reacquire the property.

Deed ¶ N (emphasis added).

43. In other words, based on the highlighted language above, so long as Plaintiff can demonstrate diligence in pursuing the temporary certificate of occupancy, it will avoid a default (and, therefore, eliminate the risk of irreparable harm).

44. The EDC Agreement further mitigates the risk of default by requiring Plaintiff to notify EDC of any issues; Section 201 (D) requires Plaintiff to submit a narrative report to EDC on the progress of construction every six months. This presumably would have required disclosure to EDC of Plaintiff's extensive damage to the CT Building and the progress on restoration efforts. EDC should be well aware of the delays caused by Plaintiff's damage.

45. At a minimum, EDC should have been made aware of this lawsuit. Under the EDC agreement, Plaintiff must report to EDC any legal action initiated by it in connection with the project "within ten (10) days after such initiation." Section 607 (c). The bottom line is that, if EDC had an issue with the progress of Plaintiff's construction, Plaintiff would have known about it by now. Yet, Plaintiff's motion papers are devoid of any express statement from EDC about the situation. And what effort has Plaintiff made to extend the deadline or otherwise eliminate this purported risk of losing the property? None of these questions are mentioned, let alone addressed, by Plaintiff's papers. All that Plaintiff presents is its prognostication of what might happen in the future, without any detail or support.

46. <u>Third</u>, Plaintiff controls the timing here. Plaintiff needs to simply fund the established cost of restoration and the timing issues will be resolved.

47. One final thought is that Plaintiff cannot stand behind the fact that the end users will be providing medical services as a basis for (a) not paying what it rightfully owes or (b) claiming that some type of emergency exists.

. . . . .

48. Based on all of the above, I respectfully request that the Court deny Plaintiff's motion.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Yacov Toledo

Dated: January 26, 2018